**LOCKHEED MARTIN CORPORATION and Lockheed Martin Advanced Environmental Systems, Inc., Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 02–5042.

United States Court of Appeals, Federal Circuit.

Sept. 30, 2002.

Before MAYER, Chief Judge, LOURIE, and LINN, Circuit Judges.

LINN, Circuit Judge.

Lockheed Martin Advanced Environmental Systems, Inc. ("LMAES") and Lockheed Martin Corporation ("LMC") seek reversal of an order dismissing their lawsuit in the Court of Federal Claims for lack of subject matter jurisdiction. Because LMAES has not demonstrated privity with the government, we affirm the decision of the Court of Federal Claims. Because LMC raises for the first time on appeal an independent cause of action based on a guarantee of performance it offered, it has waived that argument, and we do not reach it in this appeal.

Beginning in the late 1940s, the government conducted research at the Idaho National Engineering and Environmental Laboratories ("INEEL") complex near Idaho Falls, Idaho. Over time, the government released hazardous materials, including nuclear waste, at the site. In 1987, the Environmental Protection Agency ("EPA") and the Department of Energy ("DOE") agreed to clean up the site. This case involves a specific Superfund site called Pit 9, a nuclear waste site within the complex.

Lockheed Martin Idaho Technologies Company ("LMITCO") entered into a cost-plus-fee management and operating ("M & O") contract to oversee INEEL, superceding a previous contractor overseeing Pit 9.

LMITCO is a wholly-owned subsidiary of the plaintiff parent corporation, LMC. As part of its M & O responsibilities, LMITCO entered into a firm-fixed-price subcontract ("the Pit 9 subcontract") with the other plaintiff, LMAES, a subcontractor that is also a subsidiary of LMC.[1] LMC guaranteed LMAES' performance with respect to the subcontract, agreeing to return all subcontract money if LMAES did not perform. Because LMITCO, the prime contractor, and LMAES, a subcontractor, were both subsidiaries of LMC, the DOE required LMITCO to create a mitigation plan for this organizational conflict of interest.

The DOE retained contracting authority over the Pit 9 subcontract until LMITCO implemented the mitigation plan. The plan included a program oversight board and a sequestered technical oversight team of LMITCO employees. The mitigation plan required the program oversight board's membership to include a DOE employee, a LMC employee, and an independent party chosen by both. The program oversight board's responsibilities included, among other things: assuring that LMAES met subcontract specifications for soils treatment; making decisions regarding all change orders; handling directives that bore on LMC's guarantee of LMAES' performance; and ensuring that LMITCO did not perform any M & O activities under the Pit 9 subcontract. Under the mitigation plan, the program oversight board solely would direct LMAES' work. By contrast, the sequestered technical oversight team would manage the Pit 9 subcontract administration.

---

1. The original parties to the contracts at issue were Lockheed Corporation, Lockheed Idaho Technologies Company, and Lockheed Environmental Systems and Technologies Company. After Lockheed Corporation's merger with Martin Marietta Corporation, they became, respectively, Lockheed Martin Corporation, Lockheed Martin Idaho Technologies Company, and Lockheed Martin Advanced Environmental Systems, Inc. For ease of reference, we refer to them by their current names.

Work did not proceed smoothly at the jobsite, and LMAES was unable to perform much of the subcontract. As a result, LMITCO served a cure notice and terminated LMAES for default. In June 1998, plaintiffs brought suit in the Court of Federal Claims pursuant to the Contract Disputes Act ("CDA"), the Tucker Act, and the Fifth Amendment to the United States Constitution. *Lockheed Martin Corp. v. United States,* 50 Fed. Cl. 550, 552 (2001). In August 1998, LMITCO brought suit in the United States District Court for the District of Idaho against both LMAES and LMC. *Lockheed Martin Idaho Techs. Corp. v. Lockheed Martin Advanced Envtl. Sys., Inc.,* No. 98–316E (D. Idaho filed Aug. 11, 1998). LMAES and LMC counterclaimed, raising the same claims that were raised in their suit filed in the Court of Federal Claims. The government moved to dismiss plaintiffs' Court of Federal Claims lawsuit, arguing that the court did not have jurisdiction under Court of Federal Claims Rule 12(b)(1) because LMAES lacked privity with the government and that LMAES was contractually bound to litigate in Idaho. *Lockheed Martin,* 50 Fed. Cl. at 552. The government also moved to dismiss LMC's takings claim, arguing that it failed to state a claim upon which relief could be granted. *Id.* The court stayed the government's motion and required it to file an answer while LMAES sought and reviewed discovery documents from the Idaho litigation to establish jurisdiction in the Court of Federal Claims. *Id.* Following a series of dispositive motions, the Court of Federal Claims dismissed all claims except the takings claim for lack of jurisdiction and dismissed the takings claim on summary judgment. *Id.* at 566.

On appeal, the plaintiffs argue that the Court of Federal Claims erred by dismissing their claims. Plaintiffs contend that both LMAES and LMC have separate bases for privity with the government and, therefore, separate causes of action. Under LMAES' cause of action, LMAES sets forth several theories why it has a contractual relationship with the government. LMAES contends that the government assumed LMITCO's role as the prime contractor, controlled key Pit 9 management activities, and thus stepped into LMITCO's shoes, putting the government in privity with LMAES. LMAES further argues that LMITCO was merely a government agent and, therefore, LMAES and the government were in privity. The parties refer to LMAES' theories of privity as "direct control" or "direct dealings." LMAES also argues that it was in privity with the government under the test set forth in *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1551 (Fed.Cir.1983) for recognizing exceptions to the general rule that subcontractors are not in privity with the government. Under LMC's separate cause of action, it argues that LMC's guarantee of performance constituted a contract between the government and LMC, and the government breached that separate contract.

The government argues that the express terms of the Pit 9 subcontract state that the CDA does not apply, and even if it did, the claim would not be ripe because there was no government contracting officer final decision on LMAES' claim. The government also argues that LMAES cannot rely on the Tucker Act because LMAES' "direct control" and "direct dealings" theories are not supported by existing law. The government further contends that the subcontractor does not fit into one of the recognized *Johnson Controls* exceptions. With respect to LMC's contention that a breach of the guarantee of performance gives rise to a separate cause of action, the government argues that LMC did not raise that below and thus waived that argument.

## DISCUSSION

The United States Court of Federal Claims has jurisdiction to render judgment upon any claim against the United States founded upon any express or implied contract with the United States and to render judgment upon any claim by a contractor arising under Section 10(a)(1) of the CDA. 28 U.S.C. § 1491(a)(1)-(2) (2000). A contractor may bring an action directly on a claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary. 41 U.S.C. § 609(a)(1) (2000). The term "contractor" means a party to a government contract other than the government. *Id.* § 601(4). Unless the plaintiff can provide evidence of the existence of some type of contract between it and the United States, it cannot, as a subcontractor, recover directly from the United States for amounts owed to it by the prime contractor. *Putnam Mills Corp. v. United States,* 202 Ct.Cl. 1, 479 F.2d 1334, 1337 (1973) (citations omitted). Subcontractors normally are not in privity with the government and, therefore, may not appeal or sue the government, other than under the "sponsorship" approach. *Johnson Controls,* 713 F.2d at 1551. Thus, the well-entrenched rule is that a subcontractor cannot sue the government directly or bring a direct appeal against the government at a board of contract appeals. *Id.* at 1550.

While subcontractors generally cannot bring a claim directly against the government, there are a number of exceptions to the general rule and other avenues whereby a subcontractor can get direct relief. *Id.* at 1551. For example, a prime contractor may sue the government on behalf of its subcontractor, in the nature of a pass-through suit, for costs incurred by the subcontractor. *E.R. Mitchell Constr. Co. v. Danzig,* 175 F.3d 1369, 1370 (Fed. Cir.1999). Another way is for the subcontractor to show that it is in privity with the government. A subcontractor that is in privity with the government is covered by the CDA. *Acousti Eng'g Co. of Florida v. United States,* 15 Cl.Ct. 698, 700 (1988) (citing *Johnson Controls,* 713 F.2d at 1550). Privity is synonymous with a finding that there is an express or implied contract between the government and a subcontractor. *Id.* To establish privity, a subcontractor must demonstrate that

> [t]he prime contractor was (1) acting as a purchasing agent for the government, (2) the agency relationship between the government and the prime contractor was established by clear contractual consent, and (3) the contract stated that the government would be directly liable to the vendors for the purchase price.

*Johnson Controls,* 713 F.2d at 1551 (citing *Kern–Limerick, Inc. v. Scurlock,* 347 U.S. 110, 112 n. 2, 74 S.Ct. 403, 98 L.Ed. 546 (1954)). In the alternative, a subcontractor may demonstrate privity through another test described in *Johnson Controls* called the "otherwise in privity" exception. *See id.* at 1552–53.

*Johnson Controls* delineated four factors in the "otherwise in privity" test to be considered in determining whether the subcontractor could sue under the CDA:

> (1) whether the subcontractor and the government had ever had a direct contractual relationship; (2) whether the subcontract with the prime contractor contained an "ABC" clause (i.e., an express disclaimer of privity of contract between the subcontractor and the government); (3) whether the prime contractor was required to obtain a Miller Act payment bond, thereby providing a recourse by the subcontractor other than a direct appeal; and (4) whether there was any provision in any of the contract documents that clearly autho-

rized a direct appeal . . . by the subcontractor.

*RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1139 (6th Cir.1996) (citing *Johnson Controls,* 713 F.2d at 1553). In *Johnson Controls,* the "ABC" clause was an important, if not determinative, factor in this court's analysis of the intent of the parties as seen through the contract documents. 713 F.2d at 1553. Assignment of the subcontract from the prime contractor to the government, with the prime contractor relieved of all responsibility or further obligations, satisfies the "direct contractual relationship" factor. *RMI Titanium,* 78 F.3d at 1140. An express disputes clause that expressly authorizes and directs the subcontractor to bring its claim before the government contracting officer with a direct right of appeal to the board of contract appeals is strong evidence of CDA coverage of a subcontractor's claims. *Id.*

In *Johnson Controls,* this court dismissed an agency board's holding that the government, by "circumvent[ing] the independent authority of the prime contractor [such that the prime contractor] was acting as an agent of the government," contracted with the subcontractor under the first part of the test, since the "holding, by implication, recognized that there was no direct contractual relationship between the government and [subcontractor] Johnson [Controls]." *Johnson Controls,* 713 F.2d at 1552–53. Also, because the contract required the contractor to obtain a Miller Act bond, the subcontractor had a recourse other than a direct appeal or lawsuit. *Id.* at 1553–54. However, the subcontract also included a disputes clause that gave the subcontractor a direct right of appeal. *Id.* at 1554. The government argued that the disputes clause was included for "informational" purposes. *Id.* The court concluded that the disputes clause was in direct conflict with the ABC clause, which had been specially negotiated, and held that the disputes clause had not been included to give the subcontractor a right to a direct appeal or to bring a lawsuit. *Id.* at 1555.

Common among the cases cited by the plaintiff in which courts found privity between the subcontractor and the government is the government's manifestation of intent to waive sovereign immunity and allow the subcontractor to sue it. *See, e.g., RMI Titanium Co.,* 78 F.3d at 1140–41 (holding that a subcontractor's previous contractual relationship with the government, the subcontract's assignment back to the government, and a disputes clause expressly authorizing and directing the subcontractor to bring claims to the DOE contracting officer, manifested intent); *Arntz Contracting Co.,* EBCA No. 187–12–81, 83–4 BCA ¶ 17,604 (1984) (holding that government approval of a subcontract terms giving subcontractor a right to a direct appeal to the Department of Energy Board of Contract Appeals, among other things, manifested intent); *McMillin Bros. Constructors, Inc.,* EBCA No. 328–10–84, 86–3 BCA ¶ 19,179 (1986) (same). When this manifestation is lacking, privity is also lacking. *See, e.g., Johnson Controls,* 713 F.2d at 1552–53; *Seger v. United States,* 199 Ct.Cl. 766, 469 F.2d 292, 301 (1972); *Cont'l Illinois Nat'l Bank & Trust Co. v. United States,* 112 Ct.Cl. 563, 81 F.Supp. 596, 598 (1949).

After reviewing the record before us, we can find no basis for privity between LMAES and the government. Congress waived sovereign immunity when it permitted lawsuits under the CDA and Tucker Act. However, that waiver must be strictly construed. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Johnson Controls,* 713 F.2d at 1557. While LMAES argues that the government stepped into LMIT-

CO's shoes and therefore was in privity with LMAES through LMITCO, the DOE's exercise of sovereign acts, without more, does not make the contractor an agent of the DOE. *See D.R. Smalley & Sons, Inc. v. United States*, 178 Ct.Cl. 593, 372 F.2d 505, 508 (1967). The DOE is a government agency responsible for, among other things, ensuring that nuclear safety regulations are followed at its sites. Actions taken to ensure these regulations are followed, by themselves, cannot form the basis of a contract. *See id.* After the conflict of interest arose, the DOE required LMITCO to develop a conflict of interest mitigation plan acceptable to the DOE to ensure that LMITCO did not give LMAES any additional benefits beyond that which another subcontractor would enjoy. The DOE finished subcontract negotiations and temporarily managed the subcontract until LMITCO implemented a satisfactory plan. LMITCO's plan included the program oversight board and the sequestered technical oversight team. LMAES argues that the DOE controlled the board, but LMAES has failed to show how the government's actions while LMITCO developed the mitigation plan, or the mitigation plan itself, manifested an intent by the government to waive its sovereign immunity.

LMAES' theories of direct control or direct dealings as a basis for privity fail because direct interaction between the government and a subcontractor do not, by themselves, constitute a contract. *Seger*, 469 F.2d at 300–02 (no privity shown because direct dealings by themselves do not amount to an express or implied contract); *Cont'l Illinois*, 81 F.Supp. at 597–98 (rejecting privity based on direct control). In *Seger*, a subcontractor contended that excessive changes ordered by the government to a subcontract created a relationship between the subcontractor and the government that superceded the original prime contract. 469 F.2d at 300. The court rejected the subcontractor's argument, stating that "the record is barren of any creditable proof of direct dealings that would serve as a predicate for oral express or implied contracts." *Id.* at 301. "No evidence is adduced to show new contractual commitments to Seger by authorized agents of the Government." *Id.* Instead, the government channeled formal action relating to contract administration through the prime contractor, and the dealings between the government and Seger were "informal arrangements for the mutual convenience of the parties in performance of the project." *Id.* Here, the DOE chose a contractor to act as a buffer between it and its subcontractors. While the government may have been more formally involved in its dealings with LMAES than was the case in *Seger*, the direct interaction between the DOE and LMAES does not constitute a manifestation to be directly liable to LMAES. The formal dealings between LMAES and the DOE, thus, did not constitute a basis for privity.

LMAES also suggests that LMITCO acted as a government agent for the DOE, forming another basis for privity between the DOE and LMAES. For there to be privity, the contractor must have acted as a purchasing agent, the agency relationship between the government and the contractor must have been established by clear contractual consent, and the government must have been directly liable to the subcontractor for the price. *Johnson Controls*, 713 F.2d at 1551. Here, the record shows no clear contractual consent between the parties. LMAES has not pointed to anything in the record establishing privity based on these factors.

LMAES also seeks to establish privity based on the *Johnson Controls* "otherwise in privity" factors. Because sovereign immunity must be strictly construed in favor

of the sovereign, *McMahon v. United States*, 342 U.S. 25, 27, 72 S.Ct. 17, 96 L.Ed. 26 (1951), those factors that the contract does not address must be construed in favor of a finding of no privity, instead of a finding of privity as LMAES argues. LMAES did not establish that it has, or ever had, an express or implied contract between it and the government. Although there was no ABC clause in the subcontract, this cannot be interpreted to mean the DOE intended to allow LMAES to bring suit against it. Although LMITCO was not required to obtain a payment bond, LMC guaranteed LMITCO's performance. LMAES was not required to obtain a payment bond, so this factor does not weigh in favor of finding privity. Finally, LMAES does not point to any provision in the subcontract authorizing a direct appeal or a right to bring a lawsuit. Instead, the subcontract contains a clause that disputes shall be litigated in Idaho. The *Johnson Controls* factors weigh against LMAES and support the Court of Federal Claims' finding that no privity existed between LMAES and the DOE. Taking the plaintiffs' allegations as true, we cannot conclude that LMAES and the DOE entered into a contractual relationship. Thus, the Court of Federal Claims properly dismissed LMAES' causes of action against the government.

We decline to address LMC's separate cause of action that the guarantee of performance served as a basis for privity. After reviewing plaintiffs' second amended complaint and other papers before the Court of Federal Claims, we find that LMC raises this argument for the first time on appeal. Only Count XIII in the Second Amended Complaint alleges an injury to LMC that is independent of the injuries to LMAES. That count claims that the DOE failed to mitigate the conflict of interest, resulting in a taking of LMC's property interest in the Pit 9 subcontract

when LMC could not control LMITCO and LMAES "in any manner it wishe[d], free of any improper interference by the United States government." The plaintiffs do not appeal the grant of summary judgment by the Court of Federal Claims on that issue. While there are some references in the second amended complaint and the plaintiffs' opposition to the motion for summary judgment to the effect of the guarantee of performance, we find that, to the extent that these references refer to a separate cause of action by LMC, they were insufficiently developed by LMC to preserve them for appeal. The general rule is that a federal appellate court does not consider an issue not passed upon below. *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). We see no reason to deviate from that general rule here.

## CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims is *affirmed*.